

**ORDERED in the Southern District of Florida on May 10, 2012.**

Erik P. Kimball, Judge
United States Bankruptcy Court

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:

CHARLES J. KANE,

               Debtor.

_____/

STEWART TILGHMAN FOX &
BIANCHI, P.A., WILLIAM C.
HEARON, P.A., AND TODD S.
STEWART, P.A.,

               Plaintiffs,

v.

CHARLES J. KANE,

               Defendant.

_____/

Case No. 09-15557-EPK
Chapter 7

Adv. Proc. No. 09-1838-EPK

In re:

HARLEY N. KANE,                                    Case No. 09-15558-EPK
                                                   Chapter 7

       Debtor.

_____/

STEWART TILGHMAN FOX &
BIANCHI, P.A., WILLIAM C.
HEARON, P.A., AND TODD S.
STEWART, P.A.,

       Plaintiffs,

v.                                                 Adv. Proc. No. 09-1839-EPK

HARLEY N. KANE,

       Defendant.

_____/

## MEMORANDUM OPINION

THESE MATTERS came before the Court for trial on November 7, 9 and 10, 2011 and

January 20, 23 and 24, 2012 upon (a) the Complaint to Determine Dischargeability of Debts,

and Objection to Discharge [Adv. Proc. No. 09-1838-EPK, ECF No. 1] filed by Stewart

Tilghman Fox & Bianchi, P.A., William C. Hearon, P.A., and Todd S. Stewart, P.A. (together,

the "Plaintiffs") against Charles J. Kane, and (b) the Complaint to Determine Dischargeability

of Debts, and Objection to Discharge [Adv. Proc. No. 09-1839-EPK, ECF No. 1] filed by the

Plaintiffs against Harley N. Kane.  The foregoing complaints are substantially identical.  With

the consent of the parties, the Court conducted a single trial in these two adversary

proceedings.  With limited exceptions, the evidence presented addressed claims against and

defenses raised by both Charles J. Kane and Harley N. Kane (together, the "Defendants").  This

Memorandum Opinion presents the Court's findings of fact and conclusions of law in each of

the above-captioned adversary proceedings pursuant to Fed. R. Bankr. P. 7052.  Except where specifically noted, the Court's findings of fact and conclusions of law apply to both Defendants.

Each Complaint presents five counts: Count I for denial of discharge under section[1] 727(a)(2); Count II for denial of discharge under section 727(a)(5); Count III for denial of discharge under section 727(a)(7); Count IV for exception from discharge under section 523(a)(4) based on embezzlement; and Count V for exception from discharge under section 523(a)(6).  Counts IV and V seek a judgment excepting from the Defendants' discharge obligations arising under a monetary judgment entered by a Florida state court.

The Court considered the testimony of witnesses and the documentary evidence admitted at trial in these adversary proceedings, the pretrial order entered in each case containing certain stipulated facts, this Court's Order Denying Motions for Summary Judgment,[2] and the post-trial briefs filed by the parties in the form of proposed findings of fact and conclusions of law.

For the reasons stated more fully below, the Court will enter judgment in favor of both Defendants on Count I for denial of discharge under section 727(a)(2); in favor of both Defendants on Count II for denial of discharge under section 727(a)(5); against Defendant Harley Kane on Count III for denial of discharge under section 727(a)(7); in favor of Defendant Charles Kane on Count III for denial of discharge under section 727(a)(7); in favor of both Defendants on Count IV for exception from discharge under section 523(a)(4); and in favor of

---

[1] The terms "section" and "sections" refer to sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*
[2] The Order Denying Motions for Summary Judgment entered in each of these adversary proceedings is incorporated herein.

Plaintiffs and against both Defendants on Count V for exception from discharge under section 523(a)(6).

## I.    FINDINGS OF FACT

Each of the following findings of fact is derived from evidence presented at trial other than (a) the Final Judgment entered by the Circuit Court of the Fifteenth Judicial Circuit of Florida in the matter styled *Stewart Tilghman Fox & Bianchi, William C. Hearon and Todd S. Stewart, P.A. v. Kane & Kane, et al.*, Case No. 502005CA006138XXXXMBAO, admitted at trial as Plaintiff's Exhibit 2 (the "State Court Judgment") and (b) this Court's ruling in dismissing the prior chapter 11 cases of the Defendants and their law firm.  The State Court Judgment and this Court's prior ruling are addressed independently in section II of this Memorandum Opinion.

The Defendants are attorneys admitted to practice in the State of Florida.  They were the only partners in a law firm formed as a general partnership and known as Kane & Kane (the "Firm").

Prior to 2002 the Defendants and the Firm (together, the "Kanes"), working in collaboration with attorneys Laura Watson, Darren Lentner, Amir Fleischer and Gary Marks, and their respective law firms Watson & Lentner and Marks & Fleischer (all of the foregoing, together with the Kanes, the "PIP Lawyers"), filed thousands of claims and/or lawsuits in the State of Florida on behalf of approximately 441 medical providers (collectively, the "PIP Litigation") against the Progressive Insurance Companies ("Progressive").  The plaintiffs in the PIP Litigation asserted various contractual and statutory claims under the "PIP" provisions of insurance policies issued by Progressive.  Each of the PIP Lawyers brought clients to the group

taking part as plaintiffs in the PIP Litigation and formally appeared in the PIP Litigation as counsel of record for the clients they brought into the represented group.  However, all of the PIP Lawyers, including the Kanes, jointly represented all of the plaintiffs in the PIP Litigation.  Consequently, the Defendants acted as counsel for all of the plaintiffs in the PIP Litigation.  The Defendants argue here that the plaintiffs in the PIP Litigation were represented only by the PIP Lawyer that brought them to the action.  This contention is not supported by any credible evidence.

In order to increase the pressure on Progressive in the PIP Litigation, the PIP Lawyers determined to pursue claims for bad faith refusal to settle ("Bad Faith Litigation").  Although the PIP Lawyers had significant experience pursuing claims similar to those presented in the PIP Litigation, none of the PIP Lawyers had the experience or the resources to pursue Bad Faith Litigation against Progressive.

The PIP Lawyers, including the Defendants, sought assistance from the Plaintiffs to pursue Bad Faith Litigation on behalf of their clients in parallel with the PIP Litigation.  The Plaintiffs and the PIP Lawyers jointly drafted an engagement agreement for PIP Litigation clients to join in the Bad Faith Litigation.  Under this engagement agreement, all of the PIP Lawyers and the Plaintiffs jointly represented clients in the Bad Faith Litigation, starting with a single plaintiff pursuing bad faith claims against Progressive.  The goal of the PIP Lawyers and the Plaintiffs was to bring as many clients as possible from the PIP Litigation into the Bad Faith Litigation, thereby bolstering the claims presented in the PIP Litigation.  It was the intention of the Plaintiffs and the PIP Lawyers, including the Kanes, that in the end the Plaintiffs would be engaged by all or substantially all of the PIP Litigation clients in pursuit of bad faith claims against Progressive.

The Plaintiffs and the PIP Lawyers eventually entered into engagement agreements with approximately 36 plaintiffs in the Bad Faith Litigation. These clients, referred to at trial as the "Goldcoast" plaintiffs, are the only clients that signed engagement agreements directly with the Plaintiffs. The Defendants argue that the Plaintiffs represented only the "Goldcoast" plaintiffs and thus cannot seek any relief in these adversary proceedings in connection with amounts recovered by other plaintiffs in the PIP Litigation. This position is not consistent with the credible evidence admitted at trial which shows that, in spite of the fact that the Plaintiffs did not have a written engagement agreement with all of the plaintiffs in the PIP Litigation, the Plaintiffs effectively represented the interests of all of the clients in the PIP Litigation.

The Plaintiffs and the PIP Lawyers negotiated a contingent fee arrangement for compensation of the Plaintiffs. Initially, the parties agreed that the Plaintiffs would receive 60% of all contingent attorneys' fees collected from the Bad Faith Litigation.

In part because the Plaintiffs' contractual right to fees was based solely on recovery arising from bad faith claims, the Plaintiffs exerted complete control over negotiation and settlement of the bad faith claims. By their actions, the Defendants agreed to this division of labor.

The Plaintiffs' able prosecution of the Bad Faith Litigation had a significant impact on the PIP Litigation. The Plaintiffs' efforts were the lynchpin in obtaining a global settlement with Progressive. Over a period of two years beginning in 2002, the Plaintiffs undertook extensive investigation of the bad faith claims against Progressive, reviewing information provided by the PIP Lawyers with regard to all of the existing clients in the PIP Litigation (not just the so-called Goldcoast plaintiffs), brought in additional Progressive entities as defendants, added additional theories of recovery to the Bad Faith Litigation, added additional plaintiffs,

and pursued extensive and hard fought discovery from Progressive. Solely through the Plaintiffs' efforts, their clients obtained two important rulings in the Bad Faith Litigation. First, the Plaintiffs obtained a ruling that Progressive had waived the attorney-client privilege with regard to certain internal documents addressing the legality of Progressive's course of action with the plaintiffs in the Bad Faith Litigation. This ruling, by a special master, was upheld by the presiding Circuit Judge and *certiorari* was denied by the appeals court. Second, the Plaintiffs obtained a ruling to the effect that Progressive could not challenge the amount of charges claimed by each individual provider as being unreasonable because Progressive had already paid those same charges. This latter ruling eliminated some of Progressive's defenses in the Bad Faith Litigation. The former ruling brought Progressive to the settlement table, not just with regard to the Bad Faith Litigation but with regard to the PIP Litigation and any potential bad faith claims held by the plaintiffs in the PIP Litigation.

The evidence admitted at trial shows, overwhelmingly, that the Plaintiffs, the Defendants, the other PIP Lawyers, and Progressive treated the PIP Litigation and the Bad Faith Litigation as inextricably intertwined. In spite of their protestations to the contrary, there is no credible evidence to support the Defendants' contention that the Bad Faith Litigation should be considered independent of the PIP Litigation. The Defendants' testimony on this basic issue, was not believable.

Beginning in January 2004, immediately after the Plaintiffs obtained the two favorable rulings addressed above, Progressive and the Plaintiffs entered into a series of negotiations aimed at settling the bad faith claims. From the start, Progressive expressed a desire to address all of the potential bad faith claims held by the plaintiffs in the PIP Litigation, not just the claims already presented in the Bad Faith Litigation. To facilitate the negotiation, the

Plaintiffs obtained from the PIP Lawyers information concerning the claims held by all of the plaintiffs in the PIP Litigation. In January 2004, consistent with the authority given to them by the PIP Lawyers including the Kanes, the Plaintiffs made an offer to Progressive to settle all potential bad faith claims held by the plaintiffs in the PIP Litigation for $20 million. Progressive responded with an initial settlement offer, again addressing all of the potential bad faith claims that could be brought by the plaintiffs in the PIP Litigation, in the amount of $2 million. Thus, as of January 2004 the Plaintiffs were involved in active negotiation with Progressive to settle any and all potential bad faith claims that could have been brought by the PIP Litigation plaintiffs, and the range of settlement had been determined to fall between $2 million and $20 million. At that point the Plaintiffs, the PIP Lawyers and Progressive understood that the Plaintiffs were acting on behalf of all plaintiffs in the PIP Litigation in an attempt to settle the existing and potential bad faith claims.

The Plaintiffs and Progressive scheduled a formal mediation for April 2004. Progressive requested that the parties address not only the existing and potential bad faith claims, but also the claims presented in the PIP Litigation. Mr. Stewart agreed to address the PIP claims subject to obtaining authority from the PIP Lawyers and subject to an agreement from Progressive to address the bad faith claims first and then, only if settlement was reached on the bad faith claims, to address the PIP claims. Mr. Stewart wished to avoid violation of the prohibition against aggregate settlements under Rule 4-1.8 of the Rules Regulating the Florida Bar. In addition, Mr. Stewart was rightfully concerned that negotiating a settlement of the bad faith and PIP claims together would present a conflict between counsel and their clients. Mr. Stewart testified that about 90% of any recovery in the PIP Litigation would be paid to the PIP Lawyers with the remaining 10% going to the clients. Under the engagement agreement in

their case, the clients with bad faith claims would receive 60% of the recovery on those claims. Thus, any allocation of settlement funds between the PIP and bad faith claims would have a material impact on the amounts received by the clients on the one hand and the fees payable to counsel on the other. Negotiating the bad faith and PIP claims together would result in an inherent conflict of interest between counsel and the clients. Realizing the seriousness of this concern, Mr. Stewart proposed to Progressive that they first negotiate with regard to the bad faith claims and then, if a settlement was reached, move on to the PIP claims. Mr. Stewart's testimony at trial was, at all times, credible.

Before the mediation with Progressive, on April 13, 2004, Larry Stewart met with the Defendants in their offices to discuss the status of the settlement negotiations and strategy for the mediation. As did the other PIP Lawyers, the Defendants authorized the Plaintiffs to negotiate with Progressive regarding the settlement of both the bad faith claims and the PIP claims of all of the Defendants' clients. As a result of this authority and that given by the other PIP Lawyers, going into the mediation with Progressive Mr. Stewart had authority to settle all claims of the clients in the PIP Litigation and all potential bad faith claims of all such clients whether or not already presented in the Bad Faith Litigation. In consideration of the Plaintiffs' efforts in negotiating a potential settlement of the PIP claims, the PIP Lawyers, including the Kanes, agreed to increase the fee payable to the Plaintiffs to 75% of any recovery on the bad faith claims. This agreement, which was memorialized in writing, confirms that the Defendants themselves realized the close nexus between the Plaintiffs' efforts in the Bad Faith Litigation and the potential recovery of the clients in the PIP Litigation.

The increase in the contingent fee payable to the Plaintiffs is material to the Court's ruling in these cases. The PIP Lawyers and the Plaintiffs had agreed with their clients that

the lawyers, as a group, would receive 40% of any recovery on the bad faith claims.  The PIP Lawyers and the Plaintiffs, together, would share in a 40% contingent fee.  The PIP Lawyers and the Plaintiffs had agreed to a further split of this contingent fee among themselves, allocating 60% to the Plaintiffs and 40% to the PIP Lawyers.  Thus, originally, the Plaintiffs would be entitled to 24% of any recovery on the bad faith claims (60% X 40%) and the PIP Lawyers would be entitled to 16% of any recovery on the bad faith claims (40% X 40%).  In April 2004, the PIP Lawyers and the Plaintiffs re-allocated their shares of the 40% contingent fee.  The result was that the Plaintiffs would receive 30% of any recovery on the bad faith claims (75% X 40%) and the PIP Lawyers would receive 10% of any recovery on the bad faith claims (25% X 40%).  By contrast, the PIP Lawyers had agreed with the PIP clients that the PIP Lawyers would receive 90% of the proceeds obtained from the PIP Litigation.  Thus, in a settlement of all of the claims against Progressive, the allocation of recovery between PIP claims and bad faith claims would have a marked impact on the amount received by the PIP Lawyers.

At mediation on April 19, 2004, Progressive made a final offer to settle the bad faith claims for $3.5 million.  Larry Stewart made a final counter-offer of $18.5 million.  No agreement was reached at this mediation.  Mr. Stewart testified that often multiple mediations are necessary in similar cases and that failure to reach agreement at an initial mediation is not unusual.  The Court found this testimony credible.  Mr. Stewart reported on the outcome of the mediation to the PIP Lawyers.

The Defendants contend that the mediation with Progressive was a failure and that they understood Mr. Stewart's negotiations with Progressive to have ceased completely, with no hope of continuation after the mediation.  The Defendants' testimony in this regard,

particularly their claimed interpretation of e-mail correspondence immediately after the mediation, was not credible.  It is hard to imagine that seasoned, sophisticated trial lawyers such as the Defendants interpreted the communications following the mediation in the way they testified at trial.  Given the choice between finding that the Defendants were naive or that their statements were false, in light of the Defendants' significant experience in complex litigation, the Court concludes that their testimony was not truthful.

The Defendants attempt to negate a perceived argument that the Plaintiffs had obtained exclusive authority to negotiate a settlement of the PIP claims against Progressive. The Plaintiffs do not argue that they had exclusive authority to negotiate settlement of the PIP claims, only that they had authority to do so.  The PIP Lawyers, including the Defendants, gave the Plaintiffs explicit authority to negotiate a settlement of the PIP claims in addition to any existing and potential bad faith claims held by clients in the PIP Litigation.  More importantly, although the PIP Lawyers and the Plaintiffs jointly represented all clients in connection with existing and potential bad faith claims, the PIP Lawyers intended that the Plaintiffs be the only lawyers addressing the bad faith claims, in litigation and in settlement negotiations.  Other than the Defendants' testimony, which the Court did not find credible and which was not corroborated by other credible evidence, and other than the settlement discussed below, there was no evidence that any of the PIP Lawyers believed they had the authority to negotiate a settlement of the bad faith claims without involvement of the Plaintiffs.  With good cause, the Plaintiffs believed that they were the only lawyers in the group that could undertake settlement of the bad faith claims.

Immediately after the mediation with Progressive the Plaintiffs continued to aggressively pursue bad faith claims against Progressive.  They scheduled motions to compel

and for sanctions in an ongoing effort to obtain from Progressive documents that had been withheld based on Progressive's unsuccessful claim of attorney-client privilege.

Just a few weeks after the mediation with Progressive, the Defendants and the other PIP Lawyers met with Progressive and settled all of their clients' claims -- the claims raised in the PIP Litigation, the claims raised in the Bad Faith Litigation and any potential bad faith claims held by clients in the PIP Litigation -- for approximately $14.5 million (the "Secret Settlement"). Under the Secret Settlement, more than $10.9 million was allocated to attorneys' fees and costs on the PIP claims. The Kanes' share of these fees and costs exceeded $4.1 million. This was the largest gross settlement ever obtained by the Kanes.

The Secret Settlement was designed by the Defendants and the other PIP Lawyers to benefit the PIP Lawyers by augmenting their fees, and to harm the Plaintiffs by limiting the amount payable to them. The settlement meeting with Progressive and the Secret Settlement itself were arranged by all parties involved, including the Defendants, so as to freeze out the Plaintiffs, denying them any involvement in the process, any chance at negotiating a reasonable recovery on the bad faith claims, and thus any possibility of obtaining a substantial fee for their significant efforts in the presentation of those claims. The evidence is overwhelming that this was purposeful.

The Secret Settlement was accomplished at a weekend meeting of the PIP Lawyers and representatives of Progressive. In spite of the fact that the Plaintiffs had sole control over prosecution and settlement of the bad faith claims, the Plaintiffs had no notice of the settlement meeting. The timing of the settlement meeting and the intentional exclusion of the Plaintiffs from the meeting, in light of all of the other evidence admitted in these cases, is highly incriminating. The Plaintiffs had recently obtained significant judicial relief against

Progressive, forcing Progressive to discuss settlement in order to avoid releasing potentially damaging documents. Indeed, the Secret Settlement was penned while the Plaintiffs were in the process of obtaining a hearing on a motion to compel production of these documents, a fact well known to the PIP Lawyers. Mr. Stewart had taken part in a mediation that, although it did not culminate in settlement with Progressive, resulted in an offer from Progressive to settle the bad faith claims alone for $3.5 million. The mediator had suggested to Mr. Stewart that Progressive was at that time willing to go as high as twice that amount to settle only the bad faith claims, a fact known to the Defendants. The Plaintiffs had backed Progressive into a corner, Progressive had recognized the risk of a detrimental outcome, and Progressive had come to the table with a significant cash offer. The Plaintiffs' absence at the settlement meeting and in the settlement negotiations was conspicuous. The Defendants intended to exclude them.

Mr. Stewart first learned of the Secret Settlement two days after the settlement meeting. He was told by PIP Lawyers other than the Kanes that while the Secret Settlement included settlement of all existing and potential bad faith claims, no specified amount was allocated to the bad faith claims. The PIP Lawyers, including the Defendants, refused to provide the settlement documents to the Plaintiffs or even reveal the terms of the Secret Settlement to the Plaintiffs, claiming that they were prohibited from doing so under the terms of the settlement itself. The Plaintiffs were forced to file a motion with the Circuit Court to obtain an order compelling the PIP Lawyers to tender the settlement documents to the Plaintiffs. Only then, at the end of the month following the settlement meeting, were the Plaintiffs able to confirm that the Secret Settlement included a release of claims raised in the Bad Faith Litigation and all existing and potential bad faith claims of the PIP Litigation

clients, and that there was no specific allocation of the aggregate settlement amount to the bad faith claims.

The initial documentation of the Secret Settlement consisted of a Memorandum of Understanding (the "MOU") and separate letter agreements with each of the PIP Lawyers. These documents did not allocate any of the settlement proceeds to the bad faith claims. The Defendants knew that each dollar of settlement funds allocated to the PIP claims as opposed to the bad faith claims would greatly enhance their legal fee recovery and would directly reduce, or eliminate, legal fees payable to the Plaintiffs. By leaving the settlement amount undifferentiated, the PIP Lawyers, including the Defendants, intentionally allocated the entire amount to the PIP claims, thereby allowing themselves to receive 90% of the settlement proceeds as legal fees and denying any payment to the Plaintiffs.

In an effort to obtain the necessary client releases under the MOU, without consultation with the Plaintiffs, the Defendants and the other PIP Lawyers prepared a joint letter to the clients in the Bad Faith Litigation. This joint letter failed to inform the clients in the Bad Faith Litigation that the settlement included a release of all bad faith claims but allocated no specific amount to such claims, failed to inform the clients of the total amount of the settlement, failed to analyze the value of the bad faith claims to be released, and failed to disclose the amount of attorneys' fees to be paid as a result of the settlement.

The original settlement was amended by an Amended Memorandum of Understanding (the "AMOU"), which was also entered into without the knowledge or consent of the Plaintiffs. The AMOU allocates $1.75 million out of an aggregate settlement amount of $14.455 million to settlement of the claims presented in the Bad Faith Litigation. Under the AMOU, all claims held by plaintiffs in the PIP Litigation, including any potential bad faith claims, are settled for

14

a sum equal to the remainder of the aggregate settlement amount.  For the vast majority of clients the AMOU still did not allocate an amount to their potential bad faith claims.  Under the AMOU, the amount allocated to claims presented in the Bad Faith Litigation is less than half the amount offered only weeks prior by Progressive, during mediation, to settle the bad faith claims.  Why did the Defendants and the other PIP Lawyers effectuate the AMOU?  They knew that the Plaintiffs were effectively locked out of recovery under the original MOU and that the Plaintiffs had strenuously objected both to the PIP Lawyers' refusal to disclose the terms of the MOU and the news that the MOU allocated nothing to the bad faith claims.  The PIP Lawyers were not surprised by the Plaintiffs' response.  Amazingly, both the MOU and the AMOU include specific provisions pursuant to which the PIP Lawyers agreed to indemnify Progressive against claims of the Plaintiffs for attorneys' fees.  The Defendants, with the other PIP Lawyers, knew when they signed the MOU that the Plaintiffs had rightful claims to attorneys' fees commensurate with their work, that the MOU would result in no payment of fees to the Plaintiffs, and the Plaintiffs would pursue claims for such fees.  The original MOU allocated all of the settlement amount to the PIP claims in order to augment the PIP Lawyers' legal fees and deny the Plaintiffs any recovery.  The AMOU, by including a small allocation of settlement proceeds to the Bad Faith Litigation, was a weak attempt to make the settlement agreement look less incriminating.  Charles Kane testified that it was he who requested an amendment to the settlement in order to remedy the fact that no funds were allocated to the bad faith claims, in part out of concern for the Plaintiffs.  This testimony was not believable.

Immediately after execution of the MOU and the AMOU, the PIP Lawyers notified the clients in the Bad Faith Litigation that there was a disagreement between the Plaintiffs and the PIP Lawyers regarding the settlement of the clients' claims.  Charles Kane was a primary

drafter of the letter to the clients in the Bad Faith Litigation.  The PIP Lawyers then terminated the Plaintiffs' representation of clients in the Bad Faith Litigation, appeared in the Bad Faith Litigation as counsel for the plaintiffs, canceled a hearing on a motion for sanctions against Progressive stemming from the litigation previously pursued by the Plaintiffs that was instrumental in bringing Progressive to the settlement table, and voluntarily dismissed the Bad Faith Litigation.  In short, the Defendants and the other PIP Lawyers pulled the rug out from under the Plaintiffs.  The Defendants claim that they were not counsel to the plaintiffs in the Bad Faith Litigation, in an attempt to distance themselves from these actions.  This is patently false.  While the Defendants never appeared in the Bad Faith Litigation, they were parties to an engagement agreement among the plaintiffs in the Bad Faith Litigation, all of the other PIP Lawyers, and the Plaintiffs.  The plaintiffs in the Bad Faith Litigation jointly engaged all of these lawyers.

The Defendants claim that Progressive had requested that the Plaintiffs not be present at the settlement meeting and that Progressive controlled the formulation of the Secret Settlement by making a "take it or leave it" offer, skewing the settlement toward the PIP claims and allocating first nothing and then a small amount to bad faith claims.  The Defendants' after-the-fact attempt to explain away these alarming aspects of the Secret Settlement was patently self-serving, was not credible, and was not corroborated by other credible evidence.  No one forced the Defendants to agree.  They knew exactly what they were doing.  Similarly, the Defendants argue that the PIP Lawyers did not have control over the final settlement because the AMOU required approval of substantially all of the PIP and bad faith clients.  The PIP Lawyers, including the Defendants, negotiated and papered the Secret Settlement.  They were not compelled to sign the MOU or the AMOU.  Not only were the

Defendants architects of the Secret Settlement, but they forcefully recommended it to their clients while systematically removing the Plaintiffs from the process by, *inter alia*, not including the Plaintiffs in any of the negotiations and removing Plaintiffs from the Bad Faith Litigation in order to effectuate the settlement.

It was apparent during testimony of the Defendants and from the evidence as a whole that each Defendant acted not merely to pad his own pocket but also with ill will toward the Plaintiffs. Defendants' protestations that they did not intend to injure the Plaintiffs, that at most they intended to benefit themselves financially, were not credible. Even if Plaintiffs had not proven by a preponderance of the evidence that the Defendants actually intended to injure the Plaintiffs, the evidence is overwhelming that the Defendants acted intentionally in negotiating, structuring, documenting, and implementing the Secret Settlement, and that they knew, at the time of each such act, that the Plaintiffs would certainly be harmed by elimination or substantial reduction of legal fees rightfully payable to the Plaintiffs. Defendants' actions were wrongful and there was no just cause for their actions.

Following the Secret Settlement, the Plaintiffs filed suit against the PIP Lawyers in the Circuit Court for the Fifteenth Judicial Circuit of Florida (the "State Court"). Shortly after filing suit, the Plaintiffs sought an order of the State Court freezing the funds obtained by the Defendants and the other PIP Lawyers as attorneys' fees. At a hearing held on June 30, 2004, the State Court denied the requested injunction on the ground that the Plaintiffs had not shown that there would be irreparable harm absent the requested injunction as there was no evidence that a money judgment would not be sufficient. In the course of its ruling, the State Court noted that the PIP Lawyers, including the Defendants, were aware of a Florida Bar rule prohibiting them from disbursing trust funds that are in dispute. After the State Court ruled,

counsel for the Plaintiffs stated on the record that the PIP Lawyers, including the Defendants, must treat the entirety of the legal fees received in the Secret Settlement as being held in trust under the Florida Bar rules. The State Court itself suggested to the PIP Lawyers, including the Defendants, that they use other monies to pay their bills until resolution of the litigation in State Court. These statements by the State Court do not have the weight of an order. They were not necessary to the State Court's denial of the requested injunction. Nonetheless, the Defendants were then on notice that if they spent any of the attorneys' fees received in the Secret Settlement they could be subject to sanctions by the Florida Bar. The Plaintiffs' claims were bolstered by written demand to the Defendants that all legal fees resulting from the Secret Settlement be held by the Defendants in trust under Rule 5-1.1(f) of the Rules Regulating the Florida Bar.

After the Plaintiffs made demand on the Defendants, alleging that the Defendants must hold all legal fees resulting from the Secret Settlement in trust and citing Rule 5-1.1(f), the Defendants sought legal advice on this issue. Irwin Gilbert, the attorney who advised the Defendants, testified at trial in these cases. Certain correspondence between Mr. Gilbert and state court counsel for the Plaintiffs was admitted into evidence. Mr. Gilbert advised the Defendants that the Plaintiffs had no claim under Rule 5-1.1(f) to funds received by the Defendants as legal fees in connection with the PIP claims. The Defendants relied on this legal advice and transferred the legal fees obtained by them out of the Secret Settlement from their trust account to the Firm's operating account.[3]

---

[3] The Plaintiffs obtained a charging lien on the portion of the legal fees allocated to settlement of the Bad Faith Litigation. The fact that the Plaintiffs did not seek a charging lien on other settlement proceeds received by the PIP Lawyers has no effect on the Court's analysis here. In this Court's view, it would have been difficult for the Plaintiffs to obtain a charging lien on settlement proceeds in litigation where they had yet to be directly engaged by

After a lengthy non-jury trial, on April 24, 2008 the State Court entered judgment in favor of Plaintiffs and against the Kanes, jointly and severally, in the amount of $2 million, plus interest at the rate of 7% from June 22, 2004 through the end of 2005, at the rate of 9% during the year 2006, and at the rate of 11% thereafter.[4]

On May 5, 2008, the Kanes filed a motion for reconsideration and for a new trial in the State Court. The State Court held a hearing on the motion and it was denied by order dated on or about November 5, 2008. The Defendants appealed the State Court Judgment. No stay of the State Court Judgment was obtained pending appeal. The State Court Judgment was upheld on appeal, in its entirety, by order entered February 29, 2012.[5]

Each of the Defendants and the Firm filed voluntary chapter 11 petitions with this Court on November 17, 2008. The Plaintiffs moved to dismiss the chapter 11 cases. After an evidentiary hearing, on March 20, 2009 the Court delivered an oral ruling dismissing all three cases as filed in bad faith. In addition, the Court ordered that prior to the effective date of dismissal the Firm was authorized to pay only for goods and services delivered or rendered to it in the ordinary course of business and the Court specifically directed that there should be no distributions to the Defendants absent separate order of the Court. On March 20, 2009 the Court entered an order, incorporating its oral ruling, dismissing each chapter 11 case effective on March 30, 2009 (Case No. 08-27452, ECF No. 106; Case No. 08-27457, ECF No. 29; Case No. 08-27460, ECF No. 33). Also on March 20, 2009, the Court entered a separate order restricting

---

the clients. Instead, the Plaintiffs pursued the PIP Lawyers through litigation in the State Court and that proved an appropriate course of action.

[4] The Plaintiffs filed proofs of claim in each of the Defendant's cases in the amount of $2,996,866.15 plus attorneys' fees.

[5] Although the ruling on the appeal from the State Court Judgment occurred after trial in these cases, the disposition of the appeal was noted in the Defendants' post-trial briefs.

distributions from the Firm to the Defendants during the period from entry of the dismissal order until its effective date (Case No. 08-27452; ECF No. 105). All of these orders were served electronically on counsel for the Defendants that same day.

On March 24, 2009, just a few days after the Court dismissed the Kanes' chapter 11 cases, Harley Kane caused the Firm to pay real estate taxes that were his personal obligation in direct violation of this Court's order prohibiting distributions by the Firm. The Plaintiffs argue that both Defendants caused the Firm to pay these taxes, but the evidence shows that Harley Kane alone caused the firm to pay his real estate tax obligations. Neither Defendant was present when the Court ruled orally on March 20, 2009, dismissing the Kanes' chapter 11 cases and limiting distributions. Harley Kane testified that while he had spoken to his bankruptcy counsel after the hearing, and had obtained advice with regard to the Firm's ability to make ordinary course payments prior to the effective date of dismissal, he did not understand that there was any limitation on the Firm's ability to pay his real estate taxes. Harley Kane testified that he did not at the time understand the difference between the Firm and himself personally. Harley Kane testified that he did not receive a copy of the Court's written order until later on the day he caused the Firm to pay his real estate taxes, and that immediately after receiving the Court's order he called his bankruptcy counsel and then attempted to recover the payments by contacting the bank and the tax collector. Harley Kane testified that his bankruptcy counsel advised him not to file a motion to attempt to recover the payments, but to just wait and see what happened.

Harley Kane's testimony was the only evidence offered by the Defendants on these issues. It was plainly fabricated. At the hearing on March 20, 2009, when this Court dismissed the Kanes' chapter 11 cases, counsel for the Kanes, citing a recent conversation with

his clients, requested a delay in effectiveness of the dismissal order. This prompted a lengthy colloquy on the record as to the purpose of the delay and what limitations would apply to the Firm and the Defendants in the meantime. It was clear at the end of that hearing that the Firm was prohibited from paying any obligations other than for goods received and services rendered in the ordinary course of its business and that the Firm was specifically prohibited from making distributions to the Defendants. As both Defendants testified in this trial, they were well aware of the fact that payments made to others in satisfaction of their personal liability were accounted for by the Firm as subtractions from their capital accounts as partners or as loans to them personally. They both well knew that such payments were distributions to them. It is incredible that Harley Kane failed to understand that the partnership was separate from him personally, as he testified. It is equally unbelievable that the Defendants' bankruptcy counsel failed to advise Harley Kane with regard to this Court's oral ruling on March 20, 2009, and that bankruptcy counsel later advised Harley Kane not to bring the real estate tax payments, clearly made in violation of this Court's order, to the Court's attention in a timely manner.[6] On March 24, 2009 the Firm had a significant amount of cash. As is apparent from the transcript of the hearing on March 20, 2009, the Defendants knew that upon dismissal of the chapter 11 cases the Plaintiffs would immediately garnish the Firm's operating account. The delayed effectiveness of the dismissal gave Harley Kane a window to use the Firm's funds for his personal benefit, depleting the balance that would be subject to garnishment by the Plaintiffs, and he took advantage of it. It is plain to this Court that Harley

---

[6] The Court did not become aware of these payments until the chapter 7 trustee for the Firm filed an adversary proceeding to recover them. When the tax collector agreed to settle the adversary proceeding by paying to the chapter 7 trustee for the Firm the entire amount received by the tax collector (without interest), the Defendants and the Firm, along with various of their family members, objected to the settlement. (Adv. Proc. 10-01021-EPK; ECF

Kane knew of this Court's ruling and caused the Firm to pay his personal real estate tax obligations with the intent to hinder and delay the Plaintiffs.

Each of the Defendants and the Firm filed voluntary chapter 7 petitions with this Court, commencing the above captioned cases, on March 30, 2009. The Plaintiffs moved to dismiss the Kanes' chapter 7 cases, and such motions were denied by orders entered on June 2, 2009.

From January 1, 2004 through December 12, 2008, the Firm had gross income totaling more than $18.9 million. From these receipts, the Defendants received distributions aggregating approximately $8.4 million, divided nearly equally between them. This is after payment of all of the expenses of operating the Firm. The Defendants did not set aside any funds for payment of the Plaintiffs' claims. During this period, as in the past, the Defendants spent lavishly on luxury items and made numerous, sometimes questionable investments. The Defendants' schedules filed in these chapter 7 cases show assets worth approximately $1.65 million each. Charles Kane claimed exemptions aggregating approximately $1 million and Harley Kane claimed exemptions aggregating approximately $1.4 million. Thus, Charles Kane reported having less than $655,000 available for creditors and Harley Kane reported having less than $257,000 available for creditors.

The Defendants caused the Firm to maintain detailed accounting records in a consistent manner. The Defendants maintained personal financial records, fully disclosed in these cases, reflecting their assets, liabilities, income, expenditures and investments. The Defendants' financial records present a complete picture as to how their assets and income were used or, in the case of certain investments, lost. The Plaintiffs did not point to any instance where the loss or non-existence of a material asset was not satisfactorily explained by the Defendants.

No. 10). The objection was overruled and the settlement approved.

The Plaintiffs claim that the Defendants drew "excessive salaries" from the Firm. There is no evidence to support this argument. The Defendants were and are experienced trial lawyers with significant skill representing clients in PIP claims. They were the only lawyers working for the Firm. The Firm's work consisted almost entirely of contingent fee matters. Any fee earned by the Firm was the direct result of the Defendants' efforts. At all relevant times, the Firm paid its regular operating expenses in a timely manner. From the evidence presented, the Court cannot conclude that the Firm was insolvent when it made various payments to or on behalf of the Defendants. Based on the evidence presented, the amounts paid to the Defendants and on their behalves were not excessive.

The Defendants claim that they received advice of counsel relevant to the Plaintiffs' claims of willful and malicious injury and that their reliance on legal advice negates such a finding. This is not supported by the evidence. The only advice of counsel received by the Defendants was in connection with the impact of Rule 5-1.1(f) of the Rules Regulating the Florida Bar. In terms of timing, such advice was received after the Defendants had negotiated and papered the Secret Settlement, the primary acts causing harm to the Plaintiffs. In addition, the advice received does not in any manner negate the Defendants' repeated efforts to deny Plaintiffs' recovery of fees rightfully due to them. There is not even a tenuous connection between the legal advice the Defendants obtained and their wrongful acts.

The parties devoted considerable time at trial addressing whether the Firm was or was not solvent on two dates prior to the filing of these cases. The insolvency of the Firm is not a required component of any claim presented by the Plaintiffs here. However, if the Firm was insolvent on the relevant dates this fact would tend to support the Plaintiffs' allegations that certain transfers by the Firm were undertaken for the purpose of hindering, delaying or

defrauding creditors. The burden of proof falls on the Plaintiffs and they did not meet that burden.

The Plaintiffs offered testimony of and a written report prepared by Robert W. Zucker, a certified public accountant specializing in forensic accounting. Mr. Zucker was asked to opine on the solvency of the Firm on April 13, 2008 and September 14, 2008, the dates of certain transfers by the Firm to the Internal Revenue Service in payment of the personal income tax obligations of the Defendants. On those dates, the Firm owned certain cash and equipment and had certain outstanding accounts payable, but these components of the solvency analysis were not subject to material disagreement. The parties' dispute focused on two large items: (1) the value of the Firm's "book of business," meaning the value of its legal work in progress, and (2) the value of the liability represented by the State Court Judgment, both before and after its entry as the State Court Judgment was subject to a timely motion for rehearing that stayed its execution until the motion was denied in early November, 2008.

On the relevant dates, the Firm had more than 1,100 matters in progress on behalf of PIP clients. In spite of the large number of pending PIP cases, and the undisputed evidence that the vast majority of such cases result in legal fees payable to the Firm within a predictable time frame, Mr. Zucker did not take these facts into consideration in determining the value of the Firm. Instead, Mr. Zucker obtained data indicating amounts collected by the Firm in a 60-day period after each relevant date and used these collection figures, without alteration, as the value of the Firm's accounts receivable on such dates. Mr. Zucker took the position that only liquidated amounts due, resulting from settlements not yet collected, should be included in a valuation of the Firm's work in progress. He did not include any value for the Firm's extensive existing case load that had yet to result in a judgment or settlement.

The Court has ample experience in valuation of work in progress of service businesses such as the Firm. There is no single valid method for determining the value of such assets for solvency purposes in bankruptcy matters. Often the evidence comprises a statistical analysis of existing client matters in light of prior collections on similar matters over a sufficiently lengthy period of time to allow an expert, or the Court itself, to determine the likelihood and extent of collection on matters in progress. Mr. Zucker's analysis did not address any of these factors. As a result, Mr. Zucker's opinion on the value of the Firm's accounts receivable grossly undervalued the Firm's overall work in progress, the most significant component of asset valuation in this case.

The Defendants offered testimony of Rafael Katz on the value of the Firm's client matters. Mr. Katz is an attorney with extensive experience in PIP litigation who has testified numerous times in connection with attorney fee matters in PIP cases. The Defendants sought to admit Mr. Katz's opinion on the fair market value of the Firm's book of business. Because Mr. Katz is a lawyer with no experience relevant to the sale or valuation of a law firm's client matters, the Court excluded his testimony and his written report on the fair market value of the Firm's existing client matters. However, Mr. Katz testified with regard to issues relevant to the Firm's ability to generate receipts from the client matters handled by the Firm on the dates relevant to this case. Mr. Katz obtained from the Defendants copies of all of the Firm's case files for the matters pending on each of the relevant dates, data showing collections by the Firm on PIP cases over an extended period of time, information showing the average life span of PIP suits handled by the Firm, and related information. Mr. Katz audited the Firm's case load as of the two relevant dates by reviewing selected case files. Based on his review of relevant information obtained from the Firm, Mr. Katz determined the average fee earned by

the Firm in PIP cases in the prior year and multiplied this by the number of pending PIP cases on the relevant dates. He adjusted this total potential fee to take into account historical legal fee inflation and relevant Florida case law on how legal fees are determined in PIP cases. Based on his experience in PIP matters, Mr. Katz determined an appropriate success rate and applied this to reduce the overall potential fee. Looking to his audit of the Firm's client matters and other information provided by the Defendants, Mr. Katz determined the average percentage of completion in the Firm's case load and multiplied this by the aggregate potential fee to obtain an overall estimate of fees that could be collected as a result of the Firm's pending PIP matters. Mr. Katz was credible, his assumptions were reasonable and his testimony was logical and well presented. Mr. Katz testified that the Firm had PIP client matters on each of the dates relevant to these cases that would result in collected fees in excess of $3.1 million.

Mr. Zucker opined that the Firm's accounts receivable on the same dates were valued at approximately $300,000. The difference between Mr. Zucker's and Mr. Katz's valuation of the Firm's book of business is more than $2.8 million. If Mr. Katz's $3.1 million value is inserted in Mr. Zucker's solvency analysis for the Firm, found at Exhibit 3 to Plaintiffs' Exhibit 87, the Firm was solvent by more than $1.3 million on April 13, 2008 and the Firm was solvent by more than $460,000 on September 14, 2008. Notably, Mr. Zucker's solvency analysis for the Firm posits the value of the liability represented by the Plaintiffs' state court lawsuit prior to judgment at essentially the same amount as the eventual State Court Judgment including prejudgment interest, and so this analysis takes into account the Plaintiffs' actual claims in these cases.

Mr. Zucker also analyzed the value of the liability represented by the Plaintiffs' claims on the relevant dates. The first date, April 13, 2008, fell only a couple weeks prior to entry of

the State Court Judgment.  The second date, September 14, 2008, was several months after entry of the State Court Judgment but nearly two months prior to the State Court's denial of the Defendants' motion for rehearing.  Under Florida law, the State Court Judgment could not be executed until after the motion for rehearing was denied in early November, 2008.  To calculate the value of this contingent liability on the earlier date, Mr. Zucker started with the amount requested by the Plaintiffs in the State Court action, added pre-judgment interest, deducted an amount received by the Plaintiffs from another defendant, and multiplied the result by 50%.  Mr. Zucker testified that he chose 50% because this represented the probability of loss from the point of view of the Firm.  There was no detailed analysis supporting his selection of 50% as the risk of loss for the Firm.  During cross-examination it was revealed that Mr. Zucker previously testified in deposition that he had selected the 50% multiplier because it represented an equal probability of a win or loss, the only two options in litigation, implying that the probability of a win or loss in litigation is the same as a coin toss.  At trial, the Defendants emphasized this aspect of Mr. Zucker's prior testimony, and rightfully so as it points out a significant weakness in his valuation analysis.  Mr. Zucker attempted to clarify his prior testimony, stating that he believed the Kanes had a substantial likelihood of loss in the State Court matter and that they would certainly be subject to a monetary award, but Mr. Zucker did not address the potential magnitude of that monetary award.  Although Mr. Zucker testified that he completed his own review of the data to support his written report, it appears that this particular component of the analysis, the multiplier used to represent the probability of the Firm's loss in the State Court action, was inherited by Mr. Zucker from one of his partners and he gave relatively little thought to it prior to issuance of his written report.

It is possible that Mr. Zucker's selection of 50% as a risk multiplier stems from a

misunderstanding of the relevant legal standard.  When determining solvency in bankruptcy matters, courts uniformly require that material contingent liabilities be estimated based on the likelihood and potential amount of loss.  The more material the contingent liability is to the solvency analysis, the more time and effort may be required to address the potential outcome viewed from the relevant date.  A litigation claim such as that presented by the Plaintiffs in the State Court merits a searching analysis.  The confusion here, the Court believes, stems from an 11th Circuit decision mentioned by Mr. Zucker during his testimony, *Advanced Telecommunication Network, Inc. v. Allen (In re Advanced Telecommunication Network, Inc.)*, 490 F.3d 1325 (11th Cir. 2007).  In the *Advanced Telecommunication* decision, the court used the term "probability" in referring to the risk of loss analysis necessary to value a contingent liability.  The word "probability" implies a statistical analysis.  While statistics are sometimes useful in presenting evidence before this Court, a purely statistical analysis is not sufficient when valuing a contingent liability.  The probability of a coin flip, apparently like the probability of a win or loss in litigation in Mr. Zucker's view, is a yes or no proposition -- it is 50%.  Adding confusion to this issue, the *Advanced Telecommunication* case provides an example, and that example applies a 50% likelihood of success.  *In re Advanced Telecommunication Network, Inc.*, 490 F.3d at 1335.  A review of the relevant case law, however, shows that courts rely not on the statistical probability of a win or loss, but on factors tending to show whether there was an actual likelihood of loss as well as the potential magnitude of that loss in the particular circumstances of the case.  This requires a detailed review of the specific litigation, the underlying facts, how it was presented, and the like.  While the Court received evidence with regard to the case presented in the State Court, Mr. Zucker did not consider these facts in reaching his conclusion on the value of the Plaintiffs' lawsuit.

The value assigned by Mr. Zucker to the contingent liability represented by the State Court action prior to entry of the State Court Judgment, as of April 13, 2008, was $2,756,422. This is within $15,000 of the actual value of the State Court Judgment when it was entered, including pre-judgment interest. One wonders whether the 50% multiplier was selected for the pre-judgment valuation because it resulted in a value essentially the same as the value established in State Court Judgment itself.

For the foregoing reasons, the Court has given no weight to Mr. Zucker's testimony or written report with regard to the value of the contingent liability represented by the Plaintiffs' State Court action as of April 13, 2008.

Under the facts presented in this case, it was appropriate for Mr. Zucker to assign the full value of the State Court Judgment on September 14, 2008, in spite of the fact that the Defendants filed a motion for rehearing that had yet to be decided. Based on the evidence admitted here, on this latter date it was extremely unlikely that the State Court Judgment would be overturned, and indeed it was not. For purposes of valuing a contingent liability resulting from litigation, once the judgment is entered it is typically appropriate to value the liability near or at the amount of the judgment. A potential delay in collection may have an impact on valuation, reducing the value of the claim, and this may be partly or wholly offset by post-judgment interest, but a judgment once entered is obviously strong evidence of the full value of the claim. There are, of course, exceptions to this rule. For example, if an appeals court grants a stay, finding that there is a substantial likelihood of success on the merits of the appeal, this must be taken into account in valuing the liability. No such facts were present here and so the State Court Judgment should have been, and was, valued in its full amount immediately upon entry for purposes of solvency analysis.

In defending the solvency of the Firm, the Defendants argued that the State Court Judgment was not collectible until after the State Court had denied the Defendants' motion for rehearing in early November, 2008. This is correct as, under Florida law, the filing of a motion for rehearing stays collection of a judgment unless the court orders otherwise. Fla. R. Civ. P. 1.550(a). The Defendants also argued that the State Court Judgment was not collectible even after the State Court denied their motion for rehearing because it was subject to appeal. There was no stay pending appeal. As this Court pointed out in the Order Denying Motions for Summary Judgment, there is no basis for the latter argument. The State Court Judgment was subject to execution at all times during the pendency of the appeal other than when stayed as a result of bankruptcy filings in this Court. Thus, after the first week in November, 2008, the State Court Judgment was not in any manner contingent and represented a liquidated liability due and owing by the Firm and the Defendants on a joint and several basis.

The Plaintiffs argue that the schedules of assets and liabilities filed by the Firm and the Defendants in their chapter 11 and chapter 7 cases show that they were each insolvent at the time of filing and that this supports a finding of insolvency on the dates the Firm made payments to the IRS. The Kanes' schedules are signed under oath and constitute admissions with regard to the information contained therein. It appears that each of the Firm and the Defendants were in fact insolvent on the dates of filing both their chapter 11 and chapter 7 cases. Information provided in a debtor's schedules, coupled with evidence showing how the value of assets and liabilities may have changed during the period prior to the petition date, may be used to infer that a debtor was insolvent at a time prior to the petition date. Here, the Court has no evidence from which to conclude that the information shown in the Kanes' bankruptcy schedules applies equally to the dates in question. Likewise, the Plaintiffs argue

that actual receipts resulting from the Firm's client matters in existence as of the petition date in its chapter 7 case show that the Firm's book of business on prior dates was not as valuable as the Defendants claim. Again, this evidence does not necessarily reflect the value of the Firm's work in progress on a prior date without additional evidence not presented here. In fact, the other evidence admitted in these cases indicates that the Firm was quite successful in the years prior to the petition date, implying a significant value for its book of business on the relevant dates.

In light of the foregoing, the Plaintiffs did not convince the Court that the Firm's liabilities exceeded its assets on either date relevant to the claims presented here. Thus, the Plaintiffs have not proven that the Firm was insolvent on those dates.

If the Plaintiffs had met their burden of showing that the Firm had liabilities exceeding its assets, because the Defendants were the Firm's general partners the Court would need to consider the net assets of the Defendants in determining the Firm's solvency. Because the Plaintiffs did not show that the Firm's liabilities exceeded its assets, there is no need to look to the net assets of the Defendants. If the Court determined that the payments made by the Firm to the IRS constituted transfers of the Defendants' personal assets, it would be appropriate to consider the solvency of the Defendants. However, as set forth more fully below in the Court's conclusions of law, the payments made by the Firm were transfers of assets of the Firm and not assets of the individual Defendants. Consequently, the Court makes no findings with regard to the solvency of the Defendants.

## II.    Additional Findings of Fact Based on Collateral Estoppel

Collateral estoppel principles apply in discharge exception proceedings under section 523(a). *Grogan v. Garner*, 498 U.S. 279, 285 n.11 (1991). "A bankruptcy court may rely on collateral estoppel to reach conclusions about certain facts, foreclose relitigation of those facts, and then consider those facts as 'evidence of nondischargeability.'" *Thomas v. Loveless (In re Thomas)*, 288 Fed. Appx. 547, 548 (11th Cir. 2008) (citation omitted). Collateral estoppel applies equally in actions to deny discharge under section 727(a). *See Raiford v. Abney (In re Raiford)*, 695 F.2d 521 (1983); *Holber v. Jacobs (In re Jacobs)*, 381 B.R. 147, 161 (Bankr. E.D. Pa. 2008) ("The doctrine of collateral estoppel is applicable in bankruptcy proceedings involving the denial of a discharge under § 727.") "Collateral estoppel, or issue preclusion, bars relitigation of an issue previously decided in judicial or administrative proceedings if the party against whom the prior decision is asserted had a 'full and fair opportunity' to litigate that issue in an earlier case." *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 675 (11th Cir. 1993).

When a Florida state court judgment is at issue, this Court must apply the collateral estoppel law of Florida. *In re St. Laurent*, 991 F.2d at 676. Under Florida law, for a judgment to have preclusive effect, four elements must be satisfied: (1) the issue at stake must be identical to the one decided in the prior litigation; (2) the issue must have been actually litigated in the prior proceeding; (3) the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and (4) the standard of proof in the prior action must have been at least as stringent as the standard of proof in the present case. *Id.* When a federal judgment is at issue, this Court applies federal collateral estoppel law. Under federal law, for a prior judgment to have preclusive effect (1) the issue at

32

stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.  *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003) .

The Plaintiffs pointed to various findings made in the State Court Judgment and by this Court in dismissing the Kanes' prior chapter 11 cases, and asked the Court to rule that such findings have preclusive effect in the present adversary proceedings.  A number of such findings are entitled to preclusive effect in these cases.

The State Court's award of damages against the Defendants is based entirely on the theories of quantum meruit and unjust enrichment.  A substantial portion of the 23 page State Court Judgment addresses what the State Court perceived as the alarming actions of the PIP Lawyers, including the Defendants.  The State Court expressed concern at the PIP Lawyers' violation of several rules of the Florida Bar, actions at odds with the interests of their clients, and intentional harm to the Plaintiffs.  These portions of the State Court Judgment are not necessary to the State Court's award of damages under quantum meruit and unjust enrichment and are not entitled to estoppel effect here.

On the other hand, many of the State Court's findings address issues identical to issues presented in these adversary proceedings, were actually litigated there, were critical and necessary components of the State Court award, and were made under an identical burden of proof.  The following findings made by the State Court are entitled to preclusive effect in these

adversary proceedings:[7]

a.       The PIP Lawyers worked together, as a unit, to market their services to potential PIP clients.  They entered into joint engagement arrangements with PIP clients and assumed joint responsibility for the clients' claims.  While each of the PIP Lawyers appeared in litigation only on behalf of those clients they brought to the representation, each of the PIP Lawyers had an attorney-client relationship with all of the PIP clients.  This joint effort resulted in the PIP Lawyers pursuing thousands of PIP claims on behalf of numerous healthcare providers against Progressive.  (State Court Judgment, pp. 2-3).

b.       After being unable to settle the PIP claims against Progressive on a global basis, the PIP Lawyers determined to explore a possible bad faith claim against Progressive.  (State Court Judgment, p. 3).  The PIP Lawyers, including the Defendants, courted the Plaintiffs to bring them in to the representation. (State Court Judgment, pp. 3-5).

c.       Plaintiffs and the PIP Lawyers entered into an agreement whereby they would work together to bring PIP clients into the Bad Faith Litigation.  The agreement addressed the allocation of legal fees attributable to the bad faith claims.  "It is clear from reading this contract that it was contemplated that additional bad faith claims would be added as they were perfected by the [PIP Lawyers], and that the named Plaintiffs in the Goldcoast cases would be expanded."  (State Court Judgment, p. 6).

d.       Plaintiffs worked diligently on the bad faith claims for about two years, "during which time there was extensive discovery, thousands of pages of documents were produced, and there were multiple objections, motions to compel and hearings.  The issues were sufficiently

---

[7] It is not this Court's intention to identify every finding made by the State Court that was necessary to its ruling on quantum meruit and unjust enrichment grounds.  The Court identifies only those findings material to the claims

complex that, with the consent of both parties, a Special Master was appointed and Plaintiffs obtained two critical rulings: (1) that Progressive had waived any attorney-client objection to a large amount of its internal documents concerning its bill discounting activities and (2) that Progressive's payment of the underlying PIP claims was res judicata as to the reasonableness of the healthcare providers' bills. Throughout this period [the PIP Lawyers] continued to preserve and perfect their clients' bad faith claims as they occurred and continued to assist and cooperate with the Plaintiffs." (State Court Judgment, p. 6).

      e.     After the Fourth District Court of Appeals denied Progressive's petition for writ of certiorari seeking to prohibit the production of certain internal operational documents, affirming the Special Master's ruling obtained by the Plaintiffs, Progressive agreed to discuss a global settlement of the bad faith claims. The PIP Lawyers provided the Plaintiffs with detailed information regarding their clients' existing and potential bad faith claims and authorized the Plaintiffs to offer to settle all bad faith claims for $20 million. (State Court Judgment, pp. 4, 7-8).

      f.     After several months of negotiations undertaken by the Plaintiffs, Progressive indicated that it wished to address the PIP claims as well as the bad faith claims. The PIP Lawyers authorized the Plaintiffs to negotiate the settlement of the PIP claims and entered into agreements with the Plaintiffs to increase the attorneys' fees payable to the Plaintiffs as a result of settlement of any bad faith claims. (State Court Judgment, p. 8).

      g.     "On April 19, 2004 Larry Stewart attended a mediation with Progressive at which Progressive offered $3.5 million to settle all of the pending, perfected and potential bad faith claims. According to the mediator, Progressive had $6 million to $7 million to offer for the

---

presented in these adversary proceedings.

bad faith claims, but no agreement was reached at the time. Nevertheless, the Plaintiffs continued to put pressure on Progressive by demanding production of the privileged documents from Progressive. This resulted in efforts by Progressive to avoid production, an order compelling production, a sanction order and a hearing to determine the amount of those sanctions." (State Court Judgment, p. 8).

h.        "While the Plaintiffs were pressing for production of the attorney-client and/or privileged documents and [the PIP Lawyers] were urging them to keep up their efforts, the [PIP Lawyers], without the knowledge or consent of the Plaintiffs, settled all of their clients' PIP and bad faith claims, whether the latter were filed, perfected or just potential, by accepting Progressive's offer of $14.5 million. The settlement was reached on Friday, May 14, 2004. On Sunday, May 16, 2004, all of the [PIP Lawyers] met with Progressive's attorneys and assisted in drafting a Memorandum of Understanding ("MOU"). The MOU made it clear that all PIP and all bad faith claims, whether filed, perfected or just potential, were being settled for an undifferentiated sum, and in the MOU the [PIP Lawyers] represented that they had the full authority to settle all of the claims and agreed that, if necessary, they would defend and hold Progressive harmless against the claims of their own clients." (State Court Judgment, p. 9).

i.        After the Plaintiffs objected, the MOU was amended to allocate $1.75 million of the settlement proceeds to the Bad Faith Litigation. "Under the amended MOU, the remaining approximate 400 clients who were not actual parties to the Goldcoast litigation, were to still receive nothing for their unfiled, perfected and potential bad faith claims, although they were required to release those claims." (State Court Judgment, pp. 10-11).

j.        "Once the [PIP Lawyers] received the settlement proceeds on June 22, 2004, they discharged the Plaintiffs. At the same time, [the PIP Lawyers] filed Notice of Appearance (sic)

in the Goldcoast case, cancelled the sanctions hearing scheduled for the next morning and dismissed the case with prejudice." (State Court Judgment, p. 11).

k.      "The amounts taken by the [PIP Lawyers] as attorneys' fees for the PIP cases exceeded the fees they had earned in those cases. The PIP cases were county court actions that were repetitive in nature. Most of the work was done by clerical staff and/or paralegals, and there were standardized forms for everything from pleadings, motions and correspondence to checklists. The amount of attorney time required for the claims was not substantial and none of the PIP claims against Progressive were ever tried." (State Court Judgment, pp. 11-12).

l.       "It was the [PIP Lawyers] who requested Plaintiffs perform the legal services and implied in that request is an obligation to pay. Those services were accepted by and benefited the [PIP Lawyers], who had the most to gain given their claims for attorney's fees." (State Court Judgment, p. 15).

m.      The lack of engagement agreements between the Plaintiffs and the clients who had potential bad faith claims did not preclude an award in favor of the Plaintiffs. "Here the plan was always that the [PIP Lawyers] would obtain fee agreements from all the potential bad faith claimants if and when it appeared that their claims were to be settled. The only reason those agreements were never obtained is the manner in which [the PIP Lawyers] settled the case. They are, therefore, trying to benefit by their own wrongdoing." (State Court Judgment, p. 16).

n.      "It was clear from the evidence that any settlement would ultimately be a global settlement of all the bad faith claims, nor could it reasonably be argued that Progressive would have settled on any other basis. Therefore, to limit Plaintiffs' fees only to the Goldcoast cases ignores the obvious, is contrary to the understanding of the parties to the litigation and would

result in a windfall to the [PIP Lawyers], a windfall they did not earn.  Moreover, it would give credence to the methodology used to settle the case and ratify the unilateral allocation of funds to the bad faith case, which allocation was contrary to the evidence at trial."  (State Court Judgment, p. 16).

o.      Stressing these findings, the State Court reiterated that Plaintiffs' fees should not be limited to the contractual fee that would have been due as a result of settlement of claims presented in the Bad Faith Litigation.  (State Court Judgment, p. 16).

p.      The PIP Lawyers had argued that they were entitled to approximately $11 million in fees and the Plaintiffs were entitled to only $420,000.  The State Court found that "such an award would constitute unjust enrichment and would allow the [PIP Lawyers] to benefit by the work of the Plaintiffs and reward their improper conduct in the manner they settled the claim.  Neither law nor equity can allow such a result.  The attorneys' fees that were earned in the PIP litigation represented only a percentage of the combined value of the PIP and bad faith claims, and the value of the latter was a benefit conferred by the Plaintiffs' efforts. The bad faith claims were an important pressure point on Progressive, they represented the biggest damage threat, they were a driving force behind the settlement, and their release was one of the principal considerations for the settlement.  Moreover, it was the Plaintiffs' labor that made a global settlement of the PIP claims possible.   In addition to being disproportionately rewarded, [the PIP Lawyers'] after the fact conduct and methodology in their settling the "bad faith" claim -- also amount to circumstances that make it unjust for the [PIP Lawyers] to retain the benefits Plaintiffs conferred. [citation omitted] The [PIP Lawyers'] unilateral, and after the fact, allocation of certain funds to the bad faith claims does not change the fact that the Plaintiffs are entitled to, nor should the [PIP Lawyers'] conduct limit, the

reasonable fees for the services performed." (State Court Judgment, pp. 17-18)

q.    "Regardless of whether couched in terms of quantum meruit, unjust enrichment, implied in fact or quasi contract, considering the totality of the circumstances and for the reasons set forth above, the Plaintiffs are clearly entitled to reasonable compensation for the services provided, and not limited by the [PIP Lawyers'] unilateral, arbitrary and artificial allocation of the proceeds." (State Court Judgment, p. 18).

r.    The State Court found "the evidence clearly demonstrates that the Plaintiffs brought their significant reputation and experience to the bad faith claims; the bad faith claims were complex and required considerable skill; the undertaking of them precluded other employment by the Plaintiffs; the bad faith claims imposed significant responsibilities on the Plaintiffs; their fee was contingent on the outcome; and they expended over 1,200 hours before being discharged without cause.  The Plaintiffs (sic) work resulted in favorable rulings which opened the door to settlement when [the PIP Lawyers] had been unable to make any progress in that regard on their own."  Weighing the value of the work done by the Plaintiffs and the comparative value of the work done by the PIP Lawyers, the State Court ruled that the Plaintiffs were entitled to a reasonable fee as a result of work done on behalf of the Kanes' clients in the amount of $2 million.  (State Court Judgment, pp. 18-20).  The State Court also awarded interest, including pre-judgment interest, "at the statutory rate of 7% from June 22, 2004, the date the settlement proceeds were received by the Defendants, through the end of 2005, 9% during the year 2006, and 11% thereafter."  (State Court Judgment, p. 22).

Each of the foregoing findings of the State Court is entitled to collateral estoppel effect here and serves to bolster this Court's independent but substantially identical findings set out in section I of this Memorandum Opinion.

When this Court dismissed the chapter 11 cases previously filed by the Defendants and the Firm, the Court made factual findings on the record that were incorporated into the Court's order dismissing those cases. The following findings made by this Court in dismissing the Kanes' chapter 11 cases were necessary components of this Court's ruling, are identical to issues presented in these adversary proceedings, were actually litigated and the Defendants had a full and fair opportunity to address them in the chapter 11 cases, were presented subject to the same standard of proof, and thus are entitled to collateral estoppel effect here:

a.       The Defendants' "gross income figures for the tax years 2004 to 2008 are shown on Exhibit 40 admitted at the hearing [on dismissal of the Kanes' chapter 11 cases]. The evidence shows that since 2004 when the [Defendants] entered into the PIP settlement that was the subject of the [Plaintiffs'] State Court suit, each individual debtor received more than 4 million dollars in gross compensation. Even excluding 2004, each individual debtor received more than 2 million dollars. This is income to the individuals over and above the cost of running the debtor law firm."

b.       "In 2008, after the trial [in the State Court], the individual debtors grossed more than $600,000 each."

c.       "The [Defendants] did not set aside any funds to deal with their potential liability to the [Plaintiffs]."

d.       "During the years in question the [Defendants] spent money freely, luxury expenses (sic), including such items as multiple cruises, Ferrari, a $36,000 engagement ring."

e.       Based on the evidence admitted with regard to the trial in the State Court and the Defendants' significant experience as trial lawyers, this Court found that Defendants knew, and at the least should have known, that the Plaintiffs "likely would obtain a judgment

40

in a sizeable amount."

f.      "The [Defendants] were forewarned that they should set aside funds to cover their potential liability to the movants.  The movants demanded in writing that the [Defendants] hold certain attorney trust funds pending the outcome of the State Court litigation."

g.      "Even if the [Defendants] did not have a duty under Florida Bar Rule 5-1.1, the State Court admonished the [Defendants] not to spend the money they received from the PIP settlement . . . The [Defendants] should have thought more than twice before they disbursed millions of dollars under those circumstances."

h.      In dismissing the Kanes' chapter 11 cases, the most important fact relied on by this Court was that the Defendants had put themselves in the position of not being able to post an appeal bond in connection with their appeal of the State Court Judgment by spending lavishly when they knew or should have known the Plaintiffs would obtain a substantial judgment against them.  This Court stated:  "In this particular case it is the [Defendants'] motivation and intent, filing their petitions, coupled with the intentional disregard for the consequences of their pre-petition actions that show a lack of good faith in filing these [chapter 11] cases."

The findings made by this Court in dismissing the Kanes' chapter 11 cases are entitled to preclusive effect here.  This Court's prior findings only serve to bolster the independent findings set out in section I of this Memorandum Opinion.

### III.    Conclusions of Law

#### A.    Denial of Discharge under Section 727(a)(2)

Count I of the Complaint seeks denial of discharge under section 727(a)(2).  The elements of that cause of action are:  (1) an intent to hinder, delay or defraud, (2) a creditor or an officer of the estate, (3) by transferring, removing, destroying, mutilating or concealing, (4) property of the debtor, (5) within one year before the petition date or after the petition date.  Plaintiffs allege that each Defendant received more than $4 million between 2004 and 2008 and dissipated most of these funds with the actual intent to hinder, delay or defraud the Plaintiffs themselves.

The Defendants focus on the term "defraud" in the text of section 727(a)(2).  Section 727(a)(2) presents three separate bases for relief -- intent to hinder creditors, intent to delay creditors, and intent to defraud creditors.  Proof of intent to defraud is not a required element of this cause, but only a possible element.  Thus, Plaintiffs may prove their claim by presenting evidence that Plaintiffs intended to hinder or to delay creditors.

As addressed in detail above, the Plaintiffs failed to prove that the Firm was insolvent at the relevant times.  While insolvency is one of the "badges of fraud" this Court may rely upon in finding intent to hinder, delay or defraud, it is not a necessary component of the claim.  The Court may look to other evidence to conclude that the Defendants acted with intent to hinder, delay or defraud creditors.

In the year prior to the filing of these cases the Defendants caused the Firm to pay each of them compensation of approximately $700,000, and to pay the IRS in respect of the Defendants' personal tax liability.  In the same period, the Defendants caused the Firm to pay other personal expenses on their behalves.  The Defendants spent freely on luxury items.  The

42

Plaintiffs argue that the Defendants caused the Firm to make these payments and spent substantial sums with the intent of hindering, delaying or defrauding the Plaintiffs.

To the extent the allegations include transfers by the Firm, these allegations are more properly addressed under section 727(a)(7). Section 727(a)(2) requires proof of actions relating to "property of the debtor," not property of another. The Firm, a Florida general partnership, is an entity distinct from its partners and has its own assets independent of its partners. Fla. Stat. §§ 620.8201(1), 620.8203, 620.8204. Florida law provides that each partner in a general partnership is deemed to have an account with the partnership, commonly known as the partner's capital account, which is credited with the partner's contributions and share of profits and which is charged with amounts distributed to the partner and the partner's share of losses. Fla. Stat. § 620.8401(1). The purpose of the partner's capital account is to keep track of each partner's potential distributions and amounts owing by the partner to the partnership. The capital account is not a segregated fund. It is only a method of maintaining an accounting record for each partner. "Each partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits." Fla Stat. § 620.8401(2). That a partner may be entitled to a distribution under Florida law does not mean that some portion of the partnership's property is identified for and set apart for the partner. *See* Fla. Stat. §§ 620.8501, 620.8401, 620.8402. There is no support in Florida law for the Defendants' argument that amounts indicated as positive balances in their capital accounts with the Firm mean that equal sums of money held by the Firm are therefore their personal assets. Assuming that the Firm had the power under Florida law to

make distributions to the Defendants,[8] amounts distributable to the Defendants do not become their property until actually distributed. Money in the Firm's bank account is the Firm's money. It is of course possible for a partner to make an advance to the partnership, and a partner may designate funds otherwise distributable to the partner as such an advance. The advance has the effect of a loan to the partnership and the partner is entitled to repayment with interest. Fla. Stat. 620.8401(5). However, even if funds held by a partnership are deemed to have been a loan to it from a partner, such funds are partnership property and the partner holds only a claim against the partnership. The Defendants had no property interest in money held by the Firm in its bank accounts and transfers made by the Firm were transfers of the Firm's property and not transfers of property of the Defendants.

It does not matter that certain of the transfers made by the Firm were deemed by the Defendants to be partnership distributions to them. For example, the Defendants argue that payments made by the Firm to the IRS in satisfaction of the Defendants' personal income tax obligations are the equivalent of partnership distributions and were accounted for as such in their capital accounts. The Court finds nothing suspicious about this course of dealing from a practical standpoint, so long as properly reflected in the Firm's financial records. This does not change the fact, however, that the deemed distribution was a distribution of the Firm's assets. Thus, for purposes of analysis under section 727(a)(2), the Court focuses only on transfers and

---

[8] The Firm maintained its accounting records on a cash basis. Receipts were booked when actually received. Liabilities were booked when legally due. The Firm's financial records did not reflect the value of the Firm's contingent assets or contingent liabilities. Thus, it is not possible to tell from the Firm's regularly maintained accounting records whether the Firm was solvent on any particular date. Although the Plaintiffs did not prove that the Firm was insolvent, it is possible that the Firm was in fact insolvent for a period of time prior to the filing of these cases. An insolvent general partnership may not make distributions to its partners until such time as all creditors are paid. *See* Fla. Stat. § 620.8807. The Court notes that in addressing this argument the Defendants cited Fla. Stat. § 620.1806, which governs limited partnerships and is not applicable in this case.

expenditures made by the Defendants themselves, from their own funds, and not payments made directly by the Firm.

The Plaintiffs point to certain findings made by this Court in dismissing the Kanes' prior chapter 11 cases and argue that such findings are entitled to collateral estoppel effect here and prove that the Defendants had the requisite intent to hinder, delay or defraud creditors under section 727(a)(2). As discussed in the Order Denying Motions for Summary Judgment, this Court made no explicit finding with regard to the Defendants' intent in spending substantial sums prior to entry of the State Court Judgment. Such a finding was not necessary to the Court's ruling. Based on the extensive analysis in the State Court Judgment, this Court noted that the evidence presented in the State Court trial must have been damning with regard to the Defendants' actions. The Court found that this fact, combined with specific warnings from the State Court not to spend their funds, should have put the Debtors on notice that there was a significant chance they would lose and suffer a large judgment. Having spent millions of dollars in the few years prior to entry of the State Court Judgment, the Kanes were unable to post the substantial bond necessary to stay the State Court Judgment and sought the application of the automatic stay by filing chapter 11 petitions here. Under these facts, the Court ruled that it was not appropriate for the Kanes to use chapter 11 filings in this Court to stop collection on the State Court Judgment. This Court's ruling in dismissing the Defendants' chapter 11 cases is not preclusive on the issue of intent necessary to support a claim under section 727(a)(2).

That the Defendants' continued to spend lavishly after trial in the State Court and even after entry of the State Court Judgment is certainly relevant to the Plaintiffs' claims that the Defendants acted with intent to hinder, delay or defraud creditors. On the other hand, in light

of the Defendants' previous luxurious lifestyle, continued expenditure in the same vein, by itself, is not enough to meet the Plaintiffs' burden. There is little evidence showing that continued spending by the Defendants was in any way aimed at the Plaintiffs. To be sure, there was considerable animosity exhibited between the parties. This does not mean, however, that either Defendant spent with the intent to deny the Plaintiffs a recovery. Likewise, it is not plausible that the Defendants made speculative investments with the intent of harming the Plaintiffs. In cases addressing section 727(a)(2), the evidence often reveals repeated and unexplained payments to insiders, secreting of assets in undisclosed locations, and the like. If one wishes to hinder, delay or defraud creditors, it is unlikely one would choose to do so by investment, no matter how risky the venture, particularly where the investments are with unrelated third parties and are fully disclosed.

The Plaintiffs ask the Court to take into account all the circumstances of these cases in a sweeping manner -- consider the litigation in the State Court, the admonitions received by the Defendants from the State Court, the entry of the State Court Judgment, the continued litigation in connection with the Defendants' efforts to obtain a new trial, the appeal of the State Court Judgment, the Defendants' continued expenditure perhaps at an increased pace in light of their receipt of the largest legal fee of their careers -- and infer from these facts that the Defendants intended to harm the Plaintiffs. The Court is asked to find that this cloud of evidence is black at its core. The standard of proof is preponderance of the evidence. The Plaintiffs must convince the Court, by the greater weight of the evidence, that the Defendants had a specific intent to hinder, delay or defraud creditors. The evidence here does not support such a conclusion. The Plaintiffs are not entitled to relief under section 727(a)(2).

## B.    Denial of Discharge under section 727(a)(5)

Count II is an action under section 727(a)(5) for denial of discharge.  The elements of this cause of action are that: (1) the debtor failed to explain satisfactorily; (2) a loss of assets or a deficiency to meet his or her liabilities. 11 U.S.C. §727(a)(5).  The determination of whether a particular explanation is satisfactory is left to the discretion of the Court.  *Fiala v. Lindemann (In re Lindemann),* 375 B.R. 450, 472-73 (Bankr. N.D. Ill. 2007) (providing a thorough outline of the proper analysis); *accord Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984).  The Court may consider all relevant circumstances, including the materiality of any loss or deficiency in light of the facts of the case.

The Plaintiffs argue that section 727(a)(5) includes a good faith requirement, that the debtor's explanation of the loss or deficiency of assets must reflect good faith in how assets were used or dissipated, not just good faith in the maintenance of records and the presentation of the debtor's explanation.  But the focus of section 727(a)(5) is not on why the debtor expended or dissipated assets.  "The Court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper." *Great Am. Ins. Co. v. Nye (In re Nye)*, 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986); *see also Bezner v. Robbins (In re Robbins),* No. 06-3127, 2008 Bankr. LEXIS 1453 (Bankr. D.N.J. May 12, 2008) ("The definition of a reasonable explanation for § 727(a)(5) purposes is perhaps best elucidated by focusing on what it is not: it is not a justification for the use of the assets."); *Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 181 (Bankr. C.D. Ill. 2004) ("While the Trustee is critical of the Von Behrens' 'lavish spending' on vacations and nice vehicles, the focus of § 727(a)(5) is not on whether such spending is on illegal, immoral, or otherwise imprudent activities, but rather on the sufficiency of the explanation for the loss.") Other

provisions in section 727(a) address the motivation for a debtor's actions.  Section 727(a)(5) "relieves creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor." *First Commercial Fin. Grp. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002); *see also Cohen v. Olbur (In re Olbur),* 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004).

The appropriate time period for the Court's analysis is not stated in section 727(a)(5).  Courts typically consider at least the two year period prior to the petition date.  *In re Lindemann*, 375 B.R. at 472.  Depending on the circumstances of the case, it is sometimes appropriate to consider longer periods.  *Id.*  Here, the Defendants' chapter 11 petitions and their chapter 7 petitions commencing these cases were to a great extent prompted by the Plaintiffs' claims, entry of the State Court Judgment, the appeal therefrom, and the Plaintiffs' impending collection efforts.  The Defendants financial condition in 2004 when the Secret Settlement was entered into, their receipt of assets after that date, and their financial transactions since that time, are all relevant to the Court's analysis in this case.

Since 2004 the Kanes received more than $18.9 million, and more than $8.4 million of that amount was distributed to the Defendants themselves.  Thus, each Defendant had substantial and identifiable assets in the form of cash distributions received during a period of time relevant to the Court's consideration under the circumstances of these cases.  The Defendants' schedules of assets filed in these cases reveal that they held non-exempt assets of a comparably small value when they filed these cases.  The Plaintiffs met their initial burden under section 727(a)(5) by presenting evidence showing that each Defendant "owned substantial and identifiable assets that are no longer available for his creditors." *Caterpillar, Inc. v. Gonzalez (In re Gonzalez)*, 302 B.R. 745, 755 (Bankr. S.D. Fla. 2003).  The Defendants

were then obligated to provide a satisfactory explanation for the loss. *Id*.

The Defendants maintained detailed financial records in a straight-forward manner that present a complete picture as to how their assets were expended or, in the case of certain investments, lost. The Defendants caused the Firm to maintain simple accounting records in a consistent manner. All of the financial transactions of the Firm and the Defendants were fully disclosed and the evidence admitted in these adversary proceedings includes extensive financial records. This is not a case where the debtors maintained multiple bank accounts and initiated transfers through numerous entities in an apparent attempt to obfuscate their financial transactions and condition. The Plaintiffs were unable to point to any instance where the non-existence of a material asset was not explained by the Defendants. The Defendants' explanation of how and when they spent their income and used their assets was satisfactory to the Court within the meaning of section 727(a)(5). The Plaintiffs are not entitled to relief under this provision.

### C.    Denial of Discharge under section 727(a)(7)

Count III presents a claim under section 727(a)(7) for denial of discharge. To prove this cause, as presented here, the Plaintiffs must show that either Defendant: (1) acted in a manner specified in section 727(a)(2); (2) within one year prior to the petition date or after the petition date; (3) in a case involving the relevant Defendant's insider. For purposes of these adversary proceedings, the insider in question is the Firm, also a chapter 7 debtor and previously a chapter 11 debtor before this Court. The Plaintiffs allege that the Defendants caused the Firm to make improper distributions to the individual Defendants, caused the Firm to pay excessive salary to the Defendants and members of their family, caused the Firm to make other transfers

to family members, and caused the Firm to pay the personal real estate taxes of Harley Kane after this Court had ordered that the Firm was prohibited from making such a payment.

As discussed above, distributions by the Firm to the Defendants or to others in payment of personal obligations of the Defendants are transfers of property of the Firm and not transfers of the Defendants' property. Transfers from a general partnership to or for the benefit of its general partner may be made with the intent to hinder, delay or defraud a creditor, even a creditor common to the partnership and the general partner. The transfer of funds and their later dissipation often make it difficult for creditors to collect on their claims. That the transfers alleged by the Plaintiffs may not constitute fraudulent conveyances is not material to the Plaintiffs' claims. Sections 727(a)(7) and 727(a)(2) do not require proof of a fraudulent conveyance under the Bankruptcy Code or other law, only proof of intent to hinder, delay or defraud a creditor.

The Defendants argue that payments made by the Firm to satisfy personal obligations of the Defendants were preferential transfers and preferential transfers cannot form the basis of a claim under section 727(a)(7). This argument has no merit for two reasons. First, the payments in question were payments by the Firm with the Firm's money in satisfaction of debts of the Defendants. A preference is a transfer by a person or entity in satisfaction of its own obligations. 11 U.S.C. § 547. The transfers in question were not preferences. Second, a debtor may make a preferential transfer, in satisfaction of an existing debt, with the intent to hinder, delay or defraud another creditor. Several of the transfers at issue in these cases consist of the Defendants causing the Firm to pay the Defendants' non-dischargeable tax liabilities. 11 U.S.C. § 523(a)(1). The allegation is that the Defendants caused the Firm to use funds otherwise available to pay the State Court Judgment to pay debts of the Defendants that

would not be discharged in the Defendants' bankruptcy cases, with the specific intent to deny the Plaintiffs access to such funds. If proven, such a claim would implicate section 727(a)(2) from the point of view of the Firm and thus would subject the Defendants to denial of discharge under section 727(a)(7).

The Plaintiffs claim that the Defendants drew "excessive salaries" from the Firm, both directly and through causing the firm to pay their personal obligations. There is no evidence to support this conclusion. At all relevant times, the Firm paid its regular operating expenses in a timely manner. From the evidence presented, the Court cannot conclude that the Firm was insolvent when it made payments to or on behalf of the Defendants. The Defendants were and are experienced trial lawyers with significant skill representing clients in PIP claims. They were the only lawyers working for the Firm. The Firm's work consisted almost entirely of contingent fee matters. Any fee earned by the Firm was the direct result of the Defendants' efforts. Based on the evidence presented, the Defendants were entitled to the amounts paid to them and paid on their behalf.

The Plaintiffs also argue that both Defendants caused the Firm to pay Harley Kane's personal real estate tax obligations after this Court had ordered that the Firm was prohibited from doing so, with the intent of hindering, delaying or defrauding the Plaintiffs. The evidence shows that Harley Kane, but not Charles Kane, caused the Firm to make these payments. Harley Kane caused the Firm to pay his personal real estate tax obligations with the intent to hinder, delay and defraud the Plaintiffs in violation of section 727(a)(2). Accordingly, Harley Kane is denied a discharge pursuant to section 727(a)(7).

Count III of the Complaint against Harley Kane does not cite section 727(a)(6) as a basis for relief under section 727(a)(7). Nevertheless, the Plaintiffs are entitled to an order

denying Harley Kane's discharge on this basis as well.  Under section 727(a)(6), the Court must deny a discharge if a debtor has refused to obey any lawful order of the court other than an order to respond to a material question or to testify.  Because Harley Kane caused the Firm to violate section 727(a)(6) by causing the Firm to pay his personal real estate taxes in violation of this Court's order limiting distributions to the Defendants, Harley Kane violated section 727(a)(7).

Fed. R. Civ. P. 15 is made applicable to these cases by Fed. R. Bankr. P. 7015.  Rule 15(b)(2) provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move -- at any time, even after judgment -- to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue."  At trial and in their post-trial briefs, the Plaintiffs point to the Firm's violation of this Court's order limiting distributions as a basis for relief under section 727(a)(7).  During closing argument the Plaintiffs' counsel specifically referenced the real estate tax payments as direct violations of an order of this Court and pointed the Court to the March 20, 2009 oral ruling and written order.  While the Plaintiffs did not cite section 727(a)(6) in their Complaints, at trial, or in their post-trial brief, they used language essentially identical to that contained in the statute.  The Defendants did not object to the Plaintiffs' argument as exceeding that presented in the Complaint or as stating an untimely cause under Fed. R. Bankr. P. 4004(a) and thus Defendants waived such objections.  The case was tried based on this argument, evidence was presented, the Defendants attempted to rebut this evidence, and the issue is ripe for decision.  Based on the evidence presented, Harley Kane caused the Firm to violate a lawful order of this Court in contravention of section 727(a)(6) and his discharge will

be denied under section 727(a)(7).  This is an independent basis for denial of Harley Kane's discharge.

### D.    Exception from Discharge under Section 523(a)(4)

Count IV of the Complaint requests exception from discharge of a claim arising from embezzlement.  The Plaintiffs allege that the Defendants held certain legal fees in trust for the Plaintiffs and that the Defendants misappropriated such legal fees for their own purposes.

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *NesSmith Elec. Co. v. Kelley (In re Kelley)*, 84 B.R. 225, 231 (Bankr. M.D. Fla. 1988) (*quoting Moore v. United States*, 160 U.S. 268, 269 (1895)).  Embezzlement involves the intentional misappropriation of property owned by another.

At the relevant time, Rule 5-1.1(f) of the Rules Regulating the Florida Bar  provided:

> **(f) Disputed Ownership of Trust Funds.** When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property, but the portion belonging to the lawyer or law firm shall be withdrawn within a reasonable time after it becomes due unless the right of the lawyer or law firm to receive it is disputed, in which event the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

R. Regulating Fla. Bar 5-1.1(f) (2004).[9]

The Plaintiffs argue that the Kanes were in possession of property, in the form of cash proceeds of the Secret Settlement received by the Kanes as legal fees, to which the Plaintiffs had asserted an interest.  The Plaintiffs argue that, under the express language of Rule 5-1.1(f), a trust for the benefit of the Plaintiffs was created at the moment the Kanes received

such funds.  The Plaintiffs argue that the Defendants use of such funds with knowledge of the Plaintiffs' beneficial interest constitutes embezzlement.

The Rules Regulating the Florida Bar are designed to guide members of the bar in their day to day practice and to address attorney discipline.  They do not form the basis for private rights of action.  Preamble, R. Regulating Fla. Bar Ch. 4.[10]; *see Kaufman v. Davis & Meadows, P.A.*, 600 So. 2d 1208, 1211 (Fla. 1st DCA 1992).  The Plaintiffs seek a judgment that includes a finding of embezzlement.  The Plaintiffs' theory of recovery requires this Court to rule that the Plaintiffs had a beneficial interest in a trust created under Rule 5-1.1(f).  The Plaintiffs' cause of action improperly relies on the Rules as a legal basis for their claim.

The Plaintiffs argue that a beneficial interest in a trust is a property right sufficient to support an embezzlement claim.  No doubt this is the case.  However, excluding the theories of resulting and constructive trust not relevant here, an express trust must have a basis either in contract or in statute.  *See Kaplus v. Lorenzo (In re Lorenzo)*, 434 B.R. 695, 709 (Bankr. M.D. Fla. 2010); *Merrill Lynch Bus. Fin. Serv. v. Daprizio (In re Daprizio)*, 365 B.R. 268 (Bankr. S.D. Fla. 2007).  There is no trust agreement alleged in these cases.  The Rules Regulating the Florida Bar are not enacted by the Florida Legislature and do not have the power of statute.

---

[9] Rule 5-1.1(f) was subsequently amended in a manner not material to these cases.

[10] The Preamble provides in relevant part:

> Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such

The Plaintiffs had no property right in the settlement funds formerly held by the Defendants.

Proof of embezzlement requires proof of intent to take property of another. After the Plaintiffs made demand on the Defendants, alleging that the Defendants must hold all legal fees resulting from the Secret Settlement in trust and citing Rule 5-1.1(f), the Defendants sought legal advice on this issue. Counsel advised the Defendants that the Plaintiffs had no claim under Rule 5-1.1(f) to funds received by the Defendants as legal fees in connection with the PIP claims. The Defendants relied on this legal advice. The Plaintiffs argue that the Defendants could not rely on counsel's advice as his error should have been apparent to them. Based on the text of Rule 5-1.1 taken as a whole, the Court cannot say that the legal advice received by Defendants was apparently in error. In light of the legal advice received by the Defendants and their reliance thereon, the evidence does not support a finding that the Defendants acted with the requisite intent to commit embezzlement. *OnBank & Trust Co. v. Siddell (In re Siddell)*, 191 B.R. 544, 554 (Bankr. N.D.N.Y. 1996).

The Plaintiffs are not entitled to relief under section 523(a)(4).

### E.    Exception from Discharge under Section 523(a)(6)

Count V of the Complaint seeks to except from discharge under section 523(a)(6) a claim arising from willful and malicious injury to the Plaintiffs. The Plaintiffs allege that the Defendants unjustly enriched themselves at the Plaintiffs' expense by misappropriating fees owed to the Plaintiffs without justification or excuse. The debt in question is the debt represented by the State Court Judgment.

---

duty. Nevertheless, since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of a breach of the applicable standard of conduct.

An injury alleged as the basis for a non-dischargeable claim under section 523(a)(6) must be both willful and malicious. In *Kawaauhau v. Geiger*, the United States Supreme Court addressed the meaning of the term "willful" in subsection (a)(6).  523 U.S. 57 (1998).  The *Kawaauhau* court considered whether a claim for medical malpractice would be excepted from discharge. The Supreme Court determined that the reckless or negligent conduct alleged in the case before it was not sufficient to meet the requirements of section 523(a)(6). The Supreme Court then addressed what conduct may in fact result in a non-dischargeable debt under that provision, stating:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

*Id.* at 61.

While the Supreme Court unambiguously excluded injury resulting from reckless or negligent conduct from the ambit of section 523(a)(6), the *Kawaauhau* decision does not address the proof required to show intent under the Court's definition of the term "willful." The decision provides no explicit guidance as to whether a plaintiff must show that the defendant subjectively intended the resulting injury, or whether a plaintiff may prove the requisite intent by showing that the defendant undertook an intentional act that was substantially certain to result in the plaintiff's injury.  However, in its brief exposition on the concept of intent, the Supreme Court distinguished "intentional torts" from torts relying on

reckless or negligent acts, and cited the Restatement (Second) of Torts for its definition of intent.  By drawing a parallel between the concept of intent in tort at common law and the requirement of willfulness in section 523(a)(6), the Supreme Court shed light on what must be proven to discharge a debt under this provision.

To prove an intentional tort under common law it is, of course, sufficient to show that the defendant subjectively intended the harm that resulted.

> Intent is not, however, limited to consequences which are desired.  If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness . . . As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence. . . All three have their important place in the law of torts, but the liability attached to them will differ.

Restatement (Second) of Torts § 8A, cmt. b (1965).  Where a person undertakes an intentional act that injures another or property of another, but lacks a specific intent to cause the resulting injury, that person's potential liability in tort falls on a continuum based on the probability that the person's act will result in such injury.  When there is a substantial certainty that injury will result from a given intentional act, one who so acts may be held liable for an intentional tort.

By referencing this definition of "intent," the Supreme Court acknowledged that it is not necessary for a plaintiff seeking relief under section 523(a)(6) to prove that the defendant intended to cause the injury itself.  As at common law, the plaintiff may show that the defendant acted intentionally and the act in question was certain or substantially certain to result in the injury.

Consistent with this analysis, the Eleventh Circuit Court of Appeals held: "Because

Congress reenacted section 523(a)(6) in the context of the common law, we conclude that a debtor is responsible for a `willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1165 (11th Cir. 1995) (citing Restatement (Second) of Torts § 8A).  Although the Eleventh Circuit issued its decision in *Walker* prior to the Supreme Court's ruling in *Kawaauhau*, the Eleventh Circuit thereafter confirmed its analysis in *Walker. Thomas v. Loveless (In re Thomas),* 288 Fed. Appx. 547, 549 (11th Cir. 2008)  (*citing In re Walker*, 48 F.3d at 1165).

Numerous decisions support the conclusion that where injury is a substantial certainty a debtor's intentional act may result in a non-dischargeable obligation under section 523(a)(6). *E.g., Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999); *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998); *Baldwin v. Kilpatrick (In re Baldwin)*, 245 B.R. 131 (9th Cir. BAP 2000); *Via Christi Reg'l Med. Ctr. v. Budig (In re Budig)*, 240 B.R. 397, 401 (D. Kan. 1999); *Fid. Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713 (Bankr. N.D. Ill. 2000); *Avco Fin. Servs. v. Kidd (In re Kidd),* 219 B.R. 278, 285 (Bankr. D. Mont. 1998).

There is some disagreement among the courts as to whether the substantial certainty standard is a subjective standard, requiring the plaintiff to prove that the defendant knew the act was substantially certain to cause injury, or an objective standard, requiring the plaintiff to show that the defendant's act was substantially certain to cause injury without regard to the defendant's actual belief or knowledge in this regard.  *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 U.S. App. LEXIS 22754 (10th Cir. Sept. 8, 2000) (examining cases); *see also Jendusa-Nicolai v. Larsen*, No. 11-1256, 2012 U.S. App. LEXIS 7793 (7th Cir. Apr. 18, 2012).  For example, the Fifth Circuit has consistently held that substantial

certainty requires an objective analysis by the court; the defendant's personal belief or knowledge on substantial certainty need not be proven. *See Shcolnik v. Rapid Settlements Ltd. (In re Shcolnik),* 670 F.3d 624, 629 (5th Cir.  2012); *Guerra & Moore Ltd. v. Cantu (In re Cantu),* 389 Fed. Appx. 342 (5th Cir. 2010); *Red v. Baum (In re Red),* 96 Fed. Appx. 229 (5th Cir. 2004); *In re Miller*, 156 F.3d at 603 ("either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6)").  On the other hand, the Tenth Circuit has held that the term "willful" in subsection (a)(6) requires the court to determine whether the defendant knew or believed the act was substantially certain to result in injury, a subjective standard.  *In re Englehart*, 2000 U.S. App. LEXIS 22754.

Where proof of the defendant's knowledge with regard to substantial certainty is required, the defendant is unlikely to admit that he or she acted with actual knowledge an injury would result.  "In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." *Carrillo v. Su (In Re Su),* 290 F.3d 1140, 1146 n.6 (9th Cir. 2002). "The Debtor is charged with the knowledge of the natural consequences of his actions." *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby),* 591 F.3d 1199, 1206 (9th Cir. 2010) (*citing Cablevision Sys. Corp. v. Cohen (In re Cohen),* 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990)).

Most of the decisions addressing the nature of the substantial certainty analysis involve financial harm similar to that presented here. *See, e.g., In re Englehart*, 2000 U.S. App. LEXIS 22754; *Greentree Fin. Servs. v. Howard (In re Howard),* 261 B.R. 513, 521 (Bankr. M.D. Fla. 2001).  In these cases, the plaintiff typically alleges that the defendant misapplied or withheld funds or other property, interfered with contractual relations, or the like.  In financial tort

cases, because of the somewhat attenuated relationship between the defendant's act and the resulting harm, a purely objective substantial certainty analysis would bring the court dangerously close to the recklessness standard decried in *Kawaauhau*. In such cases, using a subjective standard for substantial certainty avoids this risk.[11]  For this reason, the Court applies the subjective standard in the present case.

Section 523(a)(6) also requires that the debt arise from a "malicious" injury. "Malice can be implied when a debtor commits an act that is `wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.'" *In re Thomas*, 288 Fed. Appx. at 549 (*quoting In re Walker*, 48 F.3d at 1164).

The Plaintiffs met their burden of proving by a preponderance of the evidence that, in negotiating, structuring, documenting and implementing the Secret Settlement, each Defendant acted with the specific intent of injuring the Plaintiffs by reducing the legal fees payable to the Plaintiffs.  It was apparent from the evidence presented that each Defendant acted not merely to pad his own pocket but with ill will toward the Plaintiffs.

Even if the Plaintiffs had not proven by a preponderance of the evidence that the Defendants actually intended to injure the Plaintiffs, the evidence is overwhelming that the Defendants acted intentionally in negotiating, structuring, and documenting the Secret Settlement, forcing the Plaintiffs out of the Bad Faith Litigation, and implementing the settlement with the clients, and that they knew, at the time of each such act, that the Plaintiffs

---

[11] Courts have struggled far less with physical intentional torts.  *See, e.g., Pettey v. Belanger*, 232 B.R. 543 (D. Mass. 1999); *Drewes v. Levin (In re Levin)*, 434 B.R. 910 (Bankr. S.D. Fla. 2010); *Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004); *Montgomery v. Herring (In re Herring)*, 193 B.R. 344, 352 (Bankr. N.D. Ala. 1995).  In such cases, the circumstantial evidence of the defendant's actual knowledge or belief tends to merge with the evidence supporting a finding of substantial certainty on an objective basis. To put it plainly, the willfulness of the act under section 523(a)(6) is often fairly obvious given the circumstances.

would certainly be harmed by reduction or elimination of legal fees rightfully payable to the Plaintiffs.

The Defendants' actions were wrongful.  There was no just cause for their actions. Their actions were malicious.

The Defendants argue that they did not control allocation of fees between the bad faith claims and the PIP claims and that for the Secret Settlement to become effective required approval of substantially all of the PIP and bad faith clients, which was obtained.  They argue that their actions were thus not "willful" as required by section 523(a)(6).  The Defendants' argument that they did not have control over allocation of the settlement amount is contrary to the greater weight of the evidence in this case.  The PIP Lawyers, including the Defendants, negotiated and papered the Secret Settlement.  They were not compelled to sign the MOU or the AMOU.  Not only were the Defendants architects of the Secret Settlement, but they forcefully recommended it to their clients while systematically eliminating the Plaintiffs from the process by, *inter alia*, not including the Plaintiffs in any of the negotiations and removing the Plaintiffs from the Bad Faith Litigation.  There is no question that the Defendants' actions were both willful and malicious.

Contrary to the Defendants' argument, the fact that the State Court Judgment awarded damages based on a claim of quantum meruit and unjust enrichment, rather than based on a tort claim, has no bearing on this Court's ruling.  Section 523(a) addresses certain "debts" that are excepted from discharge.  A "debt" means liability on a claim.  11 U.S.C. § 101(12).  The term "claim" is further defined in detail in section 101(5).  The damages award contained in the State Court Judgment is a liquidated debt for purposes of section 523(a).  As this Court ruled in the Order Denying Motions for Summary Judgment, the State Court Judgment has no

preclusive effect in regard to the "willful" standard under section 523(a)(6). It is rarely the case that a judgment entered by a state court addresses the elements of a claim under section 523(a)(6) as the requirement to show a willful and malicious injury usually is not necessary to the state law contract or tort claim. Indeed, even intentional tort claims at state law typically allow relief based on the reckless conduct of the defendant, and such a finding is not sufficient to support relief under section 523(a)(6). This Court must determine, under section 523(a)(6), whether the obligation represented by the State Court Judgment is a debt for willful and malicious injury by the Defendants to the Plaintiffs. This case does not present a simple intentional breach of contract claim, divorced from tortious conduct, as the Defendants argue. In the context of financial harm, it is hard to imagine a more robust claim based on willful and malicious injury.

Defendants argue that they received advice of counsel relevant to the Plaintiffs' section 523(a)(6) claim and that this negates a finding of willful and malicious injury. This is not supported by the evidence. The only advice of counsel received by the Defendants was in connection with the impact of Rule 5-1.1(f) of the Rules Regulating the Florida Bar. In terms of timing, such advice was received after the Defendants had negotiated and papered the Secret Settlement, the primary acts resulting in harm to the Plaintiffs. In addition, the advice received does not in any manner negate the Defendants' repeated efforts to deny recovery by the Plaintiffs of their rightful fees in connection with the Secret Settlement. There is not even a tenuous connection between the legal advice the Defendants obtained and their wrongful acts.

The debt represented by the State Court Judgment will be excepted from discharge in each Defendant's chapter 7 case pursuant to section 523(a)(6).

## IV.    CONCLUSION

For the foregoing reasons, the Court will enter a separate judgment in each of the above-captioned adversary proceedings:

1.      In favor of the Defendants as to Count I of the Complaint for denial of discharge under section 727(a)(2);

2.      In favor of the Defendants as to Count II of the Complaint for denial of discharge under section 727(a)(5);

3.      In favor of Charles Kane as to Count III of the Complaint for denial of discharge under section 727(a)(7);

4.      In favor of the Plaintiffs and against Harley Kane as to Count III of the Complaint for denial of discharge under section 727(a)(7);

5.      In favor of the Defendants as to Count IV of the Complaint for exception from discharge under section 523(a)(4); and

6.      In favor of the Plaintiffs and against both Defendants as to Count V of the Complaint for exception from discharge under section 523(a)(6).

### 

Copies furnished to:

All parties of record by the Clerk